IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

BLD PRODUCTS, LTC., a Michigan corporation doing business as SLOAN TRANSPORTATION PRODUCTS,

Plaintiff,

vs.

TECHNICAL PLASTICS OF OREGON, LLC, an Oregon limited liability company, MARK HARDIE, an individual,

Defendants.

Civil Case No. 05-556-KI

OPINION AND ORDER

Lawrence B. Hunt
Kevin J. Tillson
Hunt & Associates, PC
101 SW Main Street, Suite 805
Portland, Oregon 97204

Attorneys for Plaintiff

Thomas Melville
1300 NE Linden Avenue
P. O. Box 594
Gresham, Oregon 97030

Attorney for Defendants

KING, Judge:

In this action, plaintiff BLD Products, Ltd. ("BLD") is seeking to collect money owed by defendant Technical Plastics of Oregon, LLC ("TPO") for goods sold by BLD. BLD also seeks to pierce the corporate veil to get to the assets of defendant Mark Hardie, the sole owner of TPO. Before the court is Plaintiff's Motion for Summary Judgment against Defendant Mark Hardie (#58). For the reasons below, I grant the motion in part.

**FACTS**

BLD manufactures and sells hose and pipefittings, tubing, and related products. Mark Hardie is the sole member and manager of TPO and the only person who worked for TPO. Hardie had over ten years of experience in the business before he organized TPO. TPO operated out of an office occupying approximately 900 square feet of Hardie's 3,200 square foot home, as well as a warehouse. Hardie operated three other businesses out of his home office and the warehouse space rented by TPO: Marcelle Tea, Esdan America, and Atag America, Inc.

Mark Hardie is married to Mary Williams-Hardie. Williams-Hardie stated that she was minimally involved with TPO's business and only wrote checks from TPO's account or made purchases on Hardie's instructions. Hardie, however, testified that his wife handled the books and decided whether to transfer money from TPO's account to their personal account.

Hardie does not remember if he paid anything for his membership interest in TPO and believes that all monies paid to TPO were loans.

TPO had a business checking account at US Bank. Hardie and Williams-Hardie had a personal checking account there also.

The first deposit into the TPO checking account was on October 23, 2000 for $17,530. During the next week, TPO repaid a $2,000 loan from Hardie's mother, issued a check for $2,000 to Hardie's personal checking account with the notation "Payback for Business Startup/exp," and paid Williams-Hardie $3,000 with a check with the notation "repay personal account." During both January and February 2001, TPO's checking account had total withdrawals over $1,000.

Hardie and Williams-Hardie regularly used TPO to pay their personal expenses, including: landscaping services for their home containing the home office; $7,236 in cleaning services for the home, including Hardie and Williams-Hardie's master bedroom, from November 2004 through August 2005 and without any contribution from Hardie's other companies; purchases in December 2004 from GI Joe's, Wrestler's World, Made in Oregon, WWE Merchandise, K-Mart, Big 5 Sporting Goods, and the Oregon Liquor Store; purchases in 2004 and 2005 at Fred Meyer, Mattress World, Jo-Ann Fabric, Fabric Depot, and Parkrose TV Hardware, none of which Hardie could explain; credit card payments of $4,614.24 to six companies from November 2004 through August 2005 for credit cards which Hardie could not remember if they were TPO cards or personal cards except that he remembered that the Chase card was a personal credit card. Further, American Express made automatic withdrawals from the TPO checking account totaling $10,000 from January 2005 through June 2005.

TPO made payments on the loan for Hardie's Ford F-150 truck which Hardie used for the business of TPO, Marcelle Tea, and Esdan America as well as for his personal use. Hardie did not keep records of how many miles were driven for each use.

TPO supported Hardie's other businesses in several ways. TPO loaned Marcelle Tea $5,000 in August 2002 for reasons that Hardie cannot now remember. He also cannot remember if Marcelle Tea repaid the loan. In September 2002, TPO paid legal fees owed by Marcelle Tea but Hardie cannot remember why. In December 2004, TPO paid for marketing services on behalf of Marcelle Tea.

TPO paid several other personal expenses for Hardie, including $2,407 for the construction of a deck on his home; expenses for Williams-Hardie's son at Portland Community College; personal purchases during a family vacation to Disneyland and Sea World; and personal expenses incurred by Williams-Hardie on a cruise to the Bahamas.

Neither TPO nor Hardie filed tax returns for the years from 2000 through 2004.

TPO struggled financially from November 2004 through July 2005. During this time, TPO issued checks totaling approximately $32,800 to Hardie or his personal bank account without any documentation about why the disbursements were made. In January 2005, an additional $5,000 was withdrawn from TPO's checking account without any documentation on the reason for the withdrawal.

TPO filed for bankruptcy in December 2005. In its summary of bankruptcy schedules, TPO listed assets of $2,400 and liabilities of $207,789. BLD is listed as an unsecured creditor to which TPO owes approximately $120,000. Hardie admits that TPO owes BLD $115,065.08 for goods purchased in 2004 and not yet paid for.

Hardie states that TPO made some limited payments for his personal obligations, as a matter of convenience. He usually took a draw or distribution from TPO's account before paying personal obligations. Hardie did not take a salary from TPO. Hardie also took cash advances from his personal credit cards and/or other personal funds and deposited at least $39,500 into the TPO business checking account in June, July, and October 2005.

Hardie states that TPO would have remained successful if BLD had not begun a direct relationship with TPO's primary customer in late 2004. This forced TPO to file for bankruptcy.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

BLD argues that the court should pierce the corporate veil and hold Hardie liable for the debt of his company, TPO. Because TPO is a limited liability company ("LLC"), and not a corporation, the first issue is whether the doctrine can be applied at all. BLD notes opinions in other jurisdictions which have applied the law of piercing the corporate veil to determine if a member or manager of an LLC should be held individually liable for the LLC's debts. See

Bonner v. Brunson, 262 Ga. App. 521, 521-22, 585 S.E.2d 917, 918 (2003) (the court may pierce an LLC's veil if there is abuse by a member or manager).

Hardie cites a portion of the statute creating LLCs:

> The failure of a limited liability company to observe the usual limited liability company formalities or requirements relating to the exercise of its limited liability company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the limited liability company.

ORS 63.165(2). This does not directly address the issue, however, because it does not reference the improper conduct or causation prongs of the piercing doctrine.

The Oregon statute defining LLCs was enacted in 1993, many years after Amfac Foods v. Int'l Systems, 294 Or. 94, 654 P.2d 1092 (1982) discussed the doctrine under common law. If the legislature wished to fully protect the members or managers of LLCs, it could have expressly done so in the statute. I conclude that the piercing doctrine may be applied to LLCs under the same circumstances in which it is applied to corporations.

The doctrine is explained as follows:

> In Amfac Foods v. Int'l Systems, 294 Or. 94, 654 P.2d 1092 (1982), the Oregon Supreme Court discussed at length the principles underlying a claim for "veil-piercing," or disregard of the corporate form. The court cautioned that "[t]he disregard of a legally established corporate entity is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the plaintiff's injury." Id. at 103, 654 P.2d 1092. After surveying its prior decisions, the court summarized the predicates for piercing a corporate veil:
>
> "When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has

> two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff."
>
> Id. at 108-09, 654 P.2d 1092. We have characterized that formulation as a three-part test:
>
> "Thus, to pierce, the plaintiff must prove that (1) the defendant controlled the debtor corporation; (2) the defendant engaged in 'improper conduct'; and (3) as a result of that 'improper conduct,' plaintiff either entered into a transaction that it otherwise would not have entered into or plaintiff was unable to collect on a debt against the insolvent corporation."
>
> OPERB v. Simat, Helliesen & Eichner, 191 Or. App. 408, 429, 83 P.3d 350 (2004).
>
> . . . .
>
> In Amfac Foods, the court provided a number of examples of conduct that is "improper" for purposes of piercing the corporate veil: inadequate capitalization; milking through payment of excessive dividends; misrepresentation by the shareholders to the creditors; confusion or commingling of assets; holding out of the respective entities to the public as a single enterprise; and violation of statutes for the purpose of evading federal or state regulation. 294 Or. at 109-10, 654 P.2d 1092. However, the court cautioned that the "foregoing examples are just that, examples." Id. at 110, 654 P.2d 1092.

State ex rel. Neidig v. Superior Nat. Ins. Co., 208 Or. App. 1, 11-12, 14, 144 P.3d 1030 (2006) (footnote omitted).

I do not consider the fact that BLD took TPO's sole customer to be relevant. There is no evidence that anything tortious or illegal occurred. The adequacy of a remedy for BLD in the Bankruptcy Court is also immaterial. The bankruptcy estate is minimal. BLD may attempt to collect from Hardie personally if it so chooses.

I also decline to address BLD's argument that Hardie failed to adequately capitalize TPO. "A corporation is inadequately capitalized when its assets are insufficient to cover its potential liabilities, which are reasonably foreseeable from the nature of the corporation's business" Rice v. Oriental Fireworks Co., 75 Or. App. 627, 634, 707 P.2d 1250 (1985). It is not possible to say as a matter of law what an adequate amount of capitalization would be. The nature of TPO's business is not clear. This issue is better suited for a jury.

BLD contends that Hardie milked TPO by withdrawing approximately $38,000 in draws from TPO's bank account even though the company was having cash flow problems. Additionally, BLD notes the payments from TPO's business bank account to pay for numerous personal expenses of Hardie and his family. Records no longer exist documenting why the payments were made and Hardie is unable to remember. The fact that TPO had few assets, had cash flow problems, failed to pay its creditors, and failed to pay taxes on its income demonstrates, BLD argues, that Hardie drained TPO's funds to BLD's detriment. BLD argues that Hardie's conduct over the years put TPO in a position of having few assets to pay its debts. Thus, BLD contends that piercing the veil should not be limited to the documented amounts from the last year of TPO's existence.

Hardie contends that BLD knew it was dealing with an LLC and not an individual. Hardie argues that he did not milk TPO but took the draws and payments for personal expenses in lieu of a salary. He contends that the amounts he took for personal benefit were not excessive in the scope of TPO's business. Hardie also points to other debts of TPO, as documented in its bankruptcy filing, and contends that his conduct was not the cause of TPO being unable to pay BLD.

There is no issue that Hardie, as the sole member and manager of TPO, controlled the company. Turning to the second prong of the test, there is substantial evidence of improper conduct, particularly in the nature of commingling of assets and a general disregard of TPO's LLC form and status as a separate legal entity. Hardie frequently and in significant amounts paid his personal expenses from the TPO business account. The amounts are well beyond small dips into petty cash. There is inadequate documentation about how funds flowed between Hardie, as an individual, and TPO. I realize that Hardie elected to be paid in a manner other than by a regular salary but that does not excuse the lack of documentation. Hardie treated TPO and its assets as his personal funds. He also commingled TPO assets with his other businesses, again without adequate documentation. Although Hardie considered all of his contributions to TPO to be loans, there is no evidence of any promissory notes, IOUs, or other record to document this. Hardie cannot remember the reason why many of the apparently personal debts were paid from TPO funds. I conclude that there is no factual issue and that a reasonable jury could only conclude that Hardie engaged in improper conduct.

That leaves the third prong of the test, whether Hardie's improper conduct resulted in BLD being unable to collect on its approximately $120,000 debt. Amfac is instructive:

> The damages which flow from, say, improper capitalization or milking, may or may not be limited to the amount of the shortage of capital or amount milked from the corporation. In some cases the causal relationship will be clear. In others, the causal relationship will be less clear, but still sufficient to create a question for the trier of fact. For example, if the sole effect of a shareholder milking $200,000 from a corporation is to reduce the amount available for creditors, the shareholder's liability to corporate creditors would be limited to $200,000.

Amfac, 294 Or. at 111 n.18.

BLD argues that Hardie's use of TPO funds, lack of documentation, and failure to have TPO pay income taxes likely caused TPO to remain in business longer than it would have if properly managed. Further, if properly managed, BLD argues that TPO would have been able to pay its debt to BLD because TPO would have built up assets over the years to allow it to ride through the rough patch when it lost its customer. Thus, BLD contends that the causal relationship should not be limited to the approximately $38,000 in draws Hardie took when TPO was having cash flow problems.

Again, this issue is one better left for a jury. I cannot determine as a matter of law that the inability to pay the entire $120,000 debt was due to Hardie's improper conduct over the years. The argument is a good one, however, which will be resolved at trial. Consequently, I grant partial summary judgment that BLD is entitled to pierce the corporate veil, making Hardie personally liable, but that the amount for which Hardie is personally liable will have to be determined by the jury.

///

///

///

///

**CONCLUSION**

Plaintiff's Motion for Summary Judgment against Defendant Mark Hardie (#58) is granted in part as explained above.

I also deny Plaintiff's Motion for Sanctions and Attorney Fees (#33). Although I acknowledge that Hardie's actions increased BLD's cost to litigate this case, I rarely impose sanctions for discovery violations if the information sought is eventually produced. That is the case here.

IT IS SO ORDERED.

Dated this 11th day of December, 2006.

/s/ Garr M. King
Garr M. King
United States District Judge